[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 25, 2011
JOHN LEY
CLERK

_____

No. 10-12344

_____

In Re: JANIS W. STEWART and other Borrower-Crime Victims,

Petitioners,

_____

On Petition for Writ of Mandamus to
the United States District Court for the
Middle District of Florida

_____

Before TJOFLAT, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

## I.

This case involves a residential construction scheme that had its genesis in the Florida housing boom of the past decade. Large-scale home builders had hundreds of vacant lots and a variety of model homes to show prospective buyers. Their principal targets were first-time home buyers. A replica of any of the models could be purchased for 90% of the model's appraised value. The builders had a mortgage broker standing by for the prospects who could qualify for a

permanent mortgage. The prospects who could not qualify could still have the home; they could rent it from an investor provided by the mortgage broker. In a year or two, after qualifying for a permanent mortgage, they could purchase the home. Given the escalating residential market, the investor stood to be well compensated.

In addition to the 10% discount and the robust housing market, what attracted the investors was that they would not have to come up with any money until the house had been built and the builder issued a certificate of occupancy. At that point, the investor would either take out a permanent mortgage, or otherwise finance the purchase, and rent the property to the prospect. Even if the rental deal fell through, the investor could sell the house at a handsome profit.

As described, this scheme required the investor, the mortgage broker, the builder, and the bank providing the builder with the funds to construct the house to enter into certain interdependent contractual arrangements. These arrangements were necessary for the investor to avoid making any payments on the house until the house was ready for occupancy.

The scheme worked like this. Assume that the model being purchased was appraised at $100,000. The investor would enter into a contract with the builder to purchase the house and lot for $90,000. The investor would contract with the

mortgage broker to negotiate for a fee (at least two points of the purchase price) a

$90,000 construction loan, at a specified interest rate, from a bank participating in

the scheme.[1]  The bank would then pay the $90,000 construction loan proceeds to

the builder as the work progressed, in draws agreed to by the investor (as

borrower), the builder, and the bank (as lender).

The investor's contract with the builder called for the builder to pay the

construction loan closing costs, the broker's fee, and the interest the bank charged

the investor on any advances the bank made to the builder under the construction

loan.  The bank would deduct the closing costs and the broker's fee from the

builder's first draw[2] and from subsequent draws the interest due from the investor.

The scheme worked nicely in the burgeoning housing market.  As that

market collapsed, however, and the builders' potential for making a profit

diminished, many builders ceased construction, leaving hundreds of houses

unfinished.  Many of the builders went bankrupt.  Investors were left with

---

[1]  The investor gave the bank a security interest in the lot acquired from the builder when the construction loan closed.

[2]  The builder's first draw would include the cost of the lot the builder had purchased for the contracted-for house. Subsequent draws would be for particular items, such as the pouring of the slab.  The draw would be paid after the bank's inspector inspected the job site and approved the item.

unfinished houses and demands from the bank to pay the balances due on the construction loans.

That is what happened in this case. Petitioners, Stewart and those similarly situated, are investors whose builders went under and left them with unfinished houses or vacant lots. Petitioners' bank, Coast Bank of Florida ("Coast Bank"),[3] declared petitioners' construction loans in default and demanded payment. Petitioners presumably have breach-of-contract claims against their builders, which, if upheld, would mitigate their losses, but, given their builders' effective insolvency, their claims are essentially worthless.[4]

## II.

Part of the investors' indebtedness to Coast Bank consists of the broker's two-point (or more) fee included in the builder's first draw and deducted by the bank. Coast Bank's Executive Vice-President for Mortgage Lending, Philip Coon,

---

[3] First Bank is successor in interest to Coast Bank. We refer to both as Coast Bank.

[4] Petitioners' potential losses would be reduced to the extent of the value of the partially completed houses or vacant lots, and by the value of their claims against the builders.

4

received, and pocketed, 75% of one of these points under a secret kickback arrangement he had with the broker.[5]

Coon pled guilty in federal district court to depriving Coast Bank of its honest services, in violation of 18 U.S.C. §§ 1343, 1346, by illicitly accepting these sums. United States v. Coon, No. 8:08-CR-441-T-17MAP, 2010 U.S. Dist. LEXIS 57257, at *19 (M.D. Fla. May 7, 2010). Claiming to be victims of Coon's crime, petitioners moved the district court under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, for leave to appear in United States v. Coon and be heard. The district court declared that petitioners did not qualify as CVRA victims and denied their motion. Petitioners sought a writ of mandamus in this court, and we granted it. In re Stewart, 552 F.3d 1285 (11th Cir. 2008). We instructed the district court "to recognize petitioners as victims and afford them the rights of victims under the CVRA." Id. at 1289.

Complying with our instructions, the district court held hearings for six days between December 7 and 28, 2009, and thereafter issued its findings of fact and

_____

[5] The broker was John Miller, who was president of American Mortgage Link ("AML"). Before petitioners came on the scene, AML charged the investors a one-point brokerage fee. Coon persuaded Miller to raise the fee to two points, and to pay him, Coon, 75% of the additional point. Petitioners' contracts with AML called for the payment of a two-point fee. Borrowers considered a poorer credit risk paid more than two points.

conclusions of law. The court described the residential construction scheme essentially as we set it out in Part I. The court then accepted our depiction of petitioners' status as victims as defined by the CVRA. Nonetheless, the court denied their request for restitution on the ground that they suffered no loss as a consequence of having the builder pay two points instead of one point upon receipt of the first draw on petitioners' lines of credit at the Coast Bank.

Petitioners once again seek a writ of mandamus. This time, they ask that we order the district court to require Coon to make restitution in an amount equivalent to one point of their construction loans.[6] Coon is the respondent; the United States is likewise.[7]

### III.

As a threshold matter, we must address the standard under which we assess the merits of petitioners' mandamus petition. Both petitioners and respondents have briefed us on this issue. Petitioners ask that we treat the petition as an ordinary appeal, that "under the plain language and remedial design of the CVRA, the borrowers are entitled to ordinary appellate review of the claims in their

---

[6] Petitioners concede that the mortgage brokerage fee as originally contemplated by AML is legitimate. It is the added point they seek to recover, the point brought about by the broker's illicit agreement and kickback arrangement with Coon.

[7] The Government seems concerned that if we issue the writ and require Coon to make the restitution requested, it will alter the sentence Coon has received.

petition." Pet'rs' Br. 24-27. They support their request with opinions of the Second and Ninth Circuits; they also submit an unpublished opinion of the Third Circuit. See In re Walsh, 229 F. App'x. 58 (3d Cir. 2007) (per curiam); Kenna v. U.S. Dist. Court 435 F.3d 1011 (9th Cir. 2006); In re W.R. Huff Asset Mgmt. Co., 409 F.3d 555 (2d Cir. 2005). Respondents counter that the petition is not an appeal. Rather, they contend that, in enacting the CVRA, Congress created an independent cause of action against the district judge that must be entertained as a traditional petition for a writ of mandamus[8] and thus should be "governed by traditional mandamus standards, not by ordinary appellate standards." United States Br. 16. The United States cites opinions of the Fifth, Sixth, and Tenth Circuits for this proposition. See In re Antrobus, 519 F.3d 1123 (10th Cir. 2008); In re Dean, 527 F.3d 391 (5th Cir. 2008) (per curiam); In re Acker, 596 F.3d 370 (6th Cir. 2010); In re McNulty, 597 F.3d 344 (6th Cir. 2010).

In In re Stewart, we did not explicitly indicate the standard we used in setting aside the district judge's ruling that petitioners were not CVRA victims.[9]

---

[8] Respondents' position seems to be that this statutory petition, although not authorized by the All Writs Act, 28 U.S.C. § 1651, should be governed by the standard that a petitioner has to meet to obtain a writ of mandamus under § 1651.

[9] We said, "[t]he mandamus proceeding before us is a free standing cause of action, brought . . . against the district judge. . . .That is, the proceeding is not an appeal of a district court judgment, nor is it an interlocutory appeal of an intermediate order." 552 F.3d at 1288.

Both petitioners and respondents disagree on what standard we employed. Petitioners note that the dissent in Stewart "would have applied the deferential standard of review to affirm the district court." Pet'rs' Br. 26 (citing 552 F.3d at 1290 (Wilson, J., dissenting) (arguing that petitioners failed to meet the standard required to obtain a writ of mandamus, i.e., that the writ should issue "only if the lower court committed a 'clear abuse of discretion'") (citation omitted)). Petitioners now contend that the Stewart majority must have eschewed the abuse-of-discretion standard and reviewed the district judge's ruling de novo, for legal error. Pet'rs' Br. 25. Respondent Coon seems to agree, observing that "on the borrowers' prior mandamus petition, the majority opinion appears to have applied an ordinary appellate standard of review without discussion of the issue, while the dissenting judge indicated he would have applied the traditional mandamus standard of review." Coon Br. 15. The United States, to the contrary, claims that "whatever this Court may have done in In re Stewart, it did not apply the ordinary appellate standard of review." United States Br. 22.

In the matter at hand, it makes no difference whether we treat it as an appeal of a district court judgment, as if brought under 28 U.S.C. § 1291, or an original proceeding for a writ of mandamus. If considered an appeal, we would determine whether the district court erred in one of two ways: did the court base

8

its decision on findings of fact that are clearly erroneous; if not, did it misapply the law to such findings? If considered an original petition for a writ of mandamus, we would determine whether the district court abused its discretion: did the court base its decision on findings of fact that are clearly erroneous; if not, did it misapply the law to such findings?[10] Assuming, for sake of discussion, that the CVRA gives victims a right to restitution from a convicted offender, we are confident that, to prevail, a victim must demonstrate some injury—in this case monetary loss—caused by the offender's crime.

Here causation, the applicable principle of law, is not in dispute. Rather, what is in dispute is whether the district court's finding of ultimate fact is clearly erroneous. Specifically, we must determine whether the district court's finding that Coon's crime did not cause the losses petitioners suffered is clearly erroneous. If that finding is not clearly erroneous, the district court's decision cannot be disturbed—regardless of whether we reach that conclusion as an appellate court reviewing a trial court's judgment or as an appellate court, acting like a trial court, entertaining a petition for a writ of mandamus in the first instance.

---

[10] See, e.g., Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004) (explaining that a district court abuses its discretion if its findings of fact are clearly erroneous or if it improperly applies the relevant law to its findings of fact).

The district court correctly sensed that petitioners' claimed losses were suffered as a result of two scenarios. In one scenario, the builder walked off the job before construction was complete and failed to pay the interest due Coast Bank on the construction funds it had drawn, and Coast Bank declared the construction loans in default and demanded payment from petitioners. In the other scenario, after receiving its first draw on the construction funds, the builder performed no work at all. In both scenarios, the builder paid the broker's fee out of the proceeds of its first draw. In both scenarios, therefore, the amount of Coast Bank's demand on petitioners included the broker's fee, one point of which petitioners seek to recover from Coon as restitution.[11]

The district court held that petitioners suffered no loss as a result of Coon's crime and thus were not entitled to restitution. We agree. Petitioners approved the builders' first draws and thus were on notice that Coast Bank would deduct from them the broker's fee, along with other fixed administrative costs, giving the builders the balance. The cause of petitioners' loss is therefore not Coon, but the fact that the builders became insolvent and were unable or unwilling to complete their work. Petitioners assumed the risk that the builder might walk off the job;

---

[11] Recall that petitioners were obligated to the broker to pay the two-point fee, but that the builder agreed with petitioners to pay the fee along with the construction loan closing costs when it made its first draw.

that, if it did, Coast Bank would declare the construction loan in default; and that, as the bank's borrower, they would be liable for the draws the builder had received, plus interest.

The writ of mandamus is, accordingly,

DENIED.